IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| STEFANIE JONES  )<br>  )<br>        Plaintiff,  )<br>  vs.  )<br>  )<br>EQUIFAX INFORMATION  )<br>SERVICES LLC  )<br>and  )<br>SYNCHRONY FINANCIAL CORPORATION  )<br>  )<br>        Defendants.  )<br>  ) | Civil Action No. |

## COMPLAINT

### I.  Preliminary Statement

1.  This is an action for damages brought by an individual consumer against Defendants Equifax Information Services LLC and Synchrony Financial Corporation for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq*.

2.  The Defendant Equifax Information Services LLC, a consumer reporting agency ("CRA"), has been selling credit reports inaccurately marking Plaintiff as deceased.  When it inaccurately reports a living consumer as deceased the Defendant Equifax makes it practically impossible for that consumer to access credit, as it did with Mrs. Jones. Defendant Equifax's practices also harm the businesses that purchase its reports; as such companies cannot process credit applications due to the applicant's lack of a credit score.  There is no good faith rationale to explain the Defendant's practice other than the generation of revenue.  If Defendant Equifax actually believed that Mrs. Jones was deceased, it had no legally permissible basis to sell her report.  If Defendant Equifax believed Mrs. Jones was alive, it knowingly sold her report with a gross inaccuracy.  Moreover, Defendant Equifax knows that identity thieves use the credit

information of truly deceased persons to commit credit fraud. Defendant Equifax thus violated Plaintiff's rights under the Fair Credit Reporting Act ("FCRA"), as set forth below.

## II. Jurisdiction and Venue

3. Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

4. Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

## III. Parties

5. Plaintiff Stefanie Jones is an adult individual and citizen of the state of Colorado.

6. Defendant Equifax Information Services LLC (hereafter "Equifax") is a business entity that regularly conducts business in the District of Colorado, and which has a principal place of business located at 1500 Peachtree Street NW, Atlanta, Georgia 30309.

7. Defendant Synchrony Financial Corporation (hereafter "Synchrony") is a business entity that regularly conducts business in the District of Colorado, and which has a principle place of business located at 170 Election Road, Draper, UT 84020.

## IV. Factual Allegations

### Defendant's Practices Concerning the Sale of Reports on the "Deceased"

8. Defendant Equifax is regulated as a "consumer reporting agency" ("CRA") under the FCRA. 15 U.S.C. § 1681a(e).

9. Defendant Equifax sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores. 15 U.S.C. § 1681a(e). Pursuant to the FCRA, Defendant Equifax must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

10. Pursuant to the FCRA, Defendant Equifax must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C. §§ 1681e(a) & 1681b.

11. Defendant Equifax places a "deceased" notation or marking on reports when they are advised from any of their many data furnishing sources that a given consumer is deceased.

12. The furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the ECOA field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

13. Defendant Equifax does not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark on that consumer's report.

14. Defendant Equifax does not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

15. Defendant Equifax does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

16. A deceased notation is a very unusual marking upon a credit file or credit report.

17. In some cases, in order to assure accuracy, Defendant Equifax sends letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their Equifax credit file, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. But Defendant Equifax has no similar procedure to notify the consumers (such as a next of kin or executor or administrator of the

consumer's estate) when an "X" deceased code is furnished to Defendant Equifax to be placed in said consumer's credit file or report.

18. Defendant Equifax regularly receives the "Death Master File" from the Social Security Administration listing by social security number those consumers that the government believes to be deceased. But Defendant Equifax does not cross-reference the "X" code received from furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

19. Defendant Equifax will only use the Death Master File to sell additional products for an additional fee which are designed to show whether a given consumer is truly deceased.

20. Indeed, Defendant Equifax employs no procedures *at all* which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

21. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant Equifax employs no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

22. Even in instances where the purportedly deceased consumer communicates directly with Defendant Equifax, Defendant Equifax employs no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

23. Once a "deceased" mark is placed upon a consumer's report, Defendant Equifax will not calculate and will not provide a credit score for that consumer.

4

24. Nevertheless, Defendant Equifax routinely sells to third parties credit reports for persons with a "deceased" mark on their reports with no credit score, despite a request by the purchaser of the report for a credit score for that consumer.

25. Upon Defendant Equifax's report with a "deceased" mark sold to third parties Defendant never calculates or provides a credit score for that consumer.

26. Defendant Equifax knows that third party credit issuers use a credit score in order to process a given credit application.

27. Defendant Equifax knows that many third-party credit issuers require a credit score in order to process a given credit application.

28. Defendant Equifax knows that consumers without credit scores are unable to secure any credit from most credit issuers.

29. Defendant Equifax knows that living consumers are turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

30. Defendant Equifax has been put on notice for years through consumer disputes and lawsuits that living consumers are turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

31. Defendant Equifax has received and documented thousands of disputes from consumers complaining that their Equifax credit report has them erroneously marked as "deceased."

32. Defendant Equifax knows that thousands of consumers are erroneously marked as "deceased" on their Equifax credit report via an erroneous furnishing of the "X" code, but said consumers are not on the Death Master File and are, in fact, alive.

33. Nevertheless, Defendant Equifax employs no procedures which assure that a consumer marked as "deceased" on one of Defendant Equifax's reports is, in fact, deceased.

34. Even consumers who dispute the erroneous "deceased" status on their Equifax credit report continues to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

35. Defendant Equifax has no independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, which reinvestigation was triggered by a consumer dispute.

36. Nor does Defendant Equifax employ any procedures to limit or stop the furnishing of reports to third parties for consumers which they have marked as "deceased" under any circumstances.

37. For years after a consumer's actual death, Defendant Equifax will continue to sell credit reports about that consumer.

38. Defendant Equifax will only remove a deceased consumer's file from their credit reporting database when it is no longer valuable to Equifax – meaning that nobody is continuing to buy that report from Defendant Equifax.

39. Defendant Equifax charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

40. Defendant Equifax profits from the sale of reports on the deceased.

41. Defendant Equifax has in their credit reporting databases hundreds of thousands of "deceased" trade lines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

42. Defendant Equifax knows that truly deceased consumers do not apply for credit.

43. Defendant Equifax knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant Equifax to be a common and major source of identity theft.

44. Defendant Equifax knows that identity theft and credit fraud are serious and widespread problems in our society.

45. Defendant Equifax warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and require relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

46. Defendant Equifax has no similar death certificate, executorship paper, or any other proof requirements for their data sources which report a consumer as deceased or for the buyers of their reports which access the purportedly deceased consumer's information.

47. Indeed, Defendant Equifax sells reports on the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

48. For consumers who are deceased, there exists no permissible purpose under the FCRA for Defendant to ever sell their credit reports, absent a court order.

49. Defendant Equifax knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

*Case Specific Facts*

50. Plaintiff has been marked by Defendants as "deceased" on her Equifax credit reports since at least 2019. The account on which Plaintiff is marked deceased is Synchrony, account #xxxxxxxx4749.

51. Plaintiff is not deceased.

52. Defendant did not calculate or provide any credit score for or on Plaintiff, even though it sold reports about him to third parties marking him as "deceased."

53. Notwithstanding Plaintiff's efforts, Defendants continues to publish and disseminate such inaccurate information to other third parties, persons, entities and credit grantors. Defendants have repeatedly published and disseminated consumer reports to such third parties from at least 2019 through the present.

54. Plaintiff has disputed the inaccurate information with Defendant Equifax by written and electronic communications to its representatives and by following Equifax's established procedures for disputing consumer credit information.

55. Plaintiff disputed the inaccurate information with Equifax on or about March 2020.

56. On or about April 2020, Equifax issued the results of its reinvestigation and verified the inaccurate account information from the Synchrony account in which Plaintiff had been marked deceased. Had Equifax conducted a reasonable reinvestigation it would have learned that Plaintiff was not deceased, but in fact alive.

57. Notwithstanding Plaintiff's efforts, Equifax has sent Plaintiff correspondence indicating its intent to continue publishing the inaccurate information and Equifax continues to publish and disseminate such inaccurate information to other third parties, persons, entities and

credit grantors. Equifax has repeatedly published and disseminated consumer reports to such third parties from at least 2019 through the present.

58. Despite Plaintiff's efforts, Equifax failed to do some or all of the following: (1) contacted Plaintiff to follow up on, verify and/or elicit more specific information about Plaintiff's disputes; (2) contacted any third parties that would have relevant information concerning Plaintiff's disputes; (3) forwarded any relevant information concerning Plaintiff's disputes to the entities originally furnishing the inaccurate information; (4) requested or obtained any credit applications, or other relevant documents from the entities furnishing the inaccurate information; or (5) performed any handwriting analysis.

59. Notwithstanding Plaintiff's disputes, Synchrony has also failed to conduct a timely and reasonable investigation of Plaintiff's disputes after being contacted by the relevant credit reporting agency concerning Plaintiff's disputes, and has willfully continued to report such inaccurate information to Equifax, including the failure to mark the account as disputed.

60. Despite Plaintiff's exhaustive efforts to date, Defendants have nonetheless deliberately, willfully, intentionally, recklessly and negligently repeatedly failed to perform reasonable reinvestigations and/or investigations of the above disputes as required by the FCRA, have failed to remove the inaccurate information, have failed to report on the results of its reinvestigations and/or investigations to all credit reporting agencies, and have continued to report the derogatory inaccurate information about the Plaintiff.

61. As a result, Defendants made it practically impossible for Plaintiff to obtain credit.

62. As a result of Defendants' conduct, Plaintiff has suffered actual damages in the form of lost credit opportunities, credit defamation and emotional distress, including anxiety, frustration, embarrassment and humiliation.

63. At all times pertinent hereto, Defendants were acting by and through their agents, servants and/or employees who were acting within the course and scope of their agencies or employment, and under the direct supervision and control of the Defendants herein.

64. At all times pertinent hereto, the conduct of the Defendants, as well as that of their agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

## Count One – Violations of the FCRA
### (Plaintiff v. Equifax)

65. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

66. At all times pertinent hereto, Defendant was "person" and "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

67. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

68. At all times pertinent hereto, the above-mentioned credit reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d).

69. Pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o, Equifax is liable to the Plaintiff for willfully and negligently failing to comply with the requirements imposed on consumer reporting agencies of information pursuant to 15 U.S.C. § 1681e(b).

70. The conduct of Defendant was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to the Plaintiff

that are outlined more fully above and, as a result, Defendant is liable to the Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

### Count Two – Violations of the FCRA
### (Plaintiff v. Synchrony)

71. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

72. At all times pertinent hereto, Synchrony was a "person" as that term is defined by 15 U.S.C. §1681a(b).

73. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. §1681a(c).

74. Synchrony violated 15 U.S.C. §1681n and §1681o of the FCRA by willfully and negligently failing to comply with the requirements imposed on furnishers of information pursuant to 15 U.S.C. §1681s-2(b).

75. Synchrony's conduct was a direct and proximate cause, as well as a substantial factor, in causing the serious injuries, damages and harm to the Plaintiff that are outlined more fully above, and as a result Synchrony is liable to compensate Plaintiff for the full amount of statutory, actual and punitive damages, along with attorney's fees and costs, as well as such other relief, permitted by law.

### Jury Trial Demand

76. Plaintiff demands trial by jury on all issues so triable.

**Prayer for Relief**

**WHEREFORE**, Plaintiff seeks judgment in Plaintiff's favor and damages against the Defendant, based on the following requested relief:

(a) Statutory damages;

(b) Actual damages;

(c) Punitive damages;

(d) Costs and reasonable attorney's fees; and

(e) Such other and further relief as may be necessary, just and proper.

Respectfully submitted,

**FRANCIS MAILMAN SOUMILAS, P.C.**

BY: */s/ Geoffrey H. Baskerville*
GEOFFREY H. BASKERVILLE, ESQUIRE
1600 Market Street, Suite 2510
Philadelphia, PA 19103
(215) 735-8600
Attorneys for Plaintiff

Dated:  October 27, 2020